# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| SIMPLOT LIVESTOCK CO., et al, <br><br> Plaintiffs, <br><br> vs. <br><br> SUTFIN LAND & LIVESTOCK, <br><br> Defendant, <br><br> AND RELATED ACTIONS | Case No.: 1:16-cv-00139-EJL-REB <br><br> **MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT (DKT. 28)** |

Pending is Plaintiffs' Motion for Leave to Amend Complaint and Extend the Deadline to Amend Pleadings for Good Cause (Dkt. 28) ("Mot. to Amend"). Having carefully considered the record, heard oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## PROCEDURAL BACKGROUND

Plaintiffs sued Defendant in Idaho state court on February 9, 2016. Compl. (Dkt. 1, pp. 9–13). Defendant removed the action to U.S. District Court on April 4, 2016. Notice of Removal of Action (Dkt. 1). On June 14, 2016, U.S. District Judge Edward J. Lodge referred all matters in the case to this Court. Order of Reference (Dkt. 7). Thereafter, Judge Lodge entered a Scheduling Order on July 11, 2016. (Dkt. 14.) That order set November 30, 2016 as the deadline for amending pleadings. *Id.* By stipulation, the scheduling order was modified twice with respect to deadlines other than the deadline to amend pleadings. (Dkts. 15, 19 (stipulations); Dkts. 16, 20 (modified scheduling orders).) Eleven months later, on May 10, 2017, Plaintiffs moved to amend their Complaint. Mot. for Leave to File First Am. Compl. (Dkt. 22). The Defendant filed a notice of non-opposition (Dkt. 21), this Court granted Plaintiffs' motion (Dkt. 25), and Plaintiffs' First

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT – 1**

Amended Complaint was filed (Dkt. 26).

On August 29, 2017, Plaintiffs filed a motion to amend the already amended complaint. Mot. to Amend (Dkt. 28). Plaintiffs seek to add a claim to pierce the corporate veil of Defendant and to join three new individual defendants who Plaintiffs allege are Defendant's shareholders. *Id.* The amendment deadline has passed. *See* Scheduling Order (Dkt. 14). The case has not yet been set for trial. *See* Order Adopting 3/21/17 Stipulation to Modify Scheduling Order (Dkt. 20).

Defendant previously filed a Counterclaim and Third-Party Complaint, but that filing is not relevant to the instant motion and will not be further discussed in this memorandum decision. Answer, Countercl., Third-Party Compl. and Demand for Jury Trial (Dkt. 3).

## **LEGAL STANDARDS**

Rule 15(a) of the Federal Rules of Civil Procedure provides in relevant part that "[t]he court should freely give leave" to amend "when justice so requires." However, after a scheduling order has been entered, the court may modify the schedule only for good cause. FED. R. CIV. P. 16(b)(4). Thus, a "party seeking to amend [a] pleading after [the] date specified in [a] scheduling order must first show 'good cause' for amendment under Rule 16(b), then, if 'good cause' be shown, the party must demonstrate that amendment [is] proper under Rule 15." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992) (citation omitted). Rule 16's good cause inquiry focuses primarily on the diligence of the party requesting the amendment. *Id.* at 609. "Rule 16 was designed to facilitate more efficient disposition of cases by settlement or by trial. If disregarded it would 'undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier.'" *Walker v. City of Pocatello*, 2017 WL 1650014 at *1 (D. Idaho May 1, 2017) (quoting *Johnson*, 975 F.2d at 610); *see also* Rule 16 Advisory Committee Notes (1983 Amendment). As explained in *Johnson*:

> Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension. . . Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Id.* (quotation marks and citations omitted). In addition, district courts are "given broad discretion in supervising the pretrial phase of litigation," including with respect to "decisions regarding the preclusive effect of a pretrial order." *Johnson*, 972 F.2d at 607. If good cause exists under Rule 16(b), "leave to amend should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay." *Id.*; s*ee also Branch Banking and Trust Co. v. D.M.S.I., LLC*, 871 F.3d 751, 764 (9th Cir. 2017) (applying *Johnson* and demonstrating it is still controlling law).

Plaintiffs' motion seeks to add a claim to pierce Defendant's corporate veil. Mot. to Amend 1 (Dkt. 28). Because this is a diversity action over which the Court exercises original jurisdiction pursuant to 28 U.S.C. § 1332, Idaho law applies to the claim. Piercing the corporate veil under Idaho law requires "(1) a unity of interest and ownership to a degree that the separate personalities of the [company] and individual no longer exist and (2) if the acts are treated as acts of the [company] an inequitable result would follow." *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 376 (Idaho 2014) (alterations in original) (citation omitted).

## **DISCUSSION**

The instant motion turns on whether Plaintiffs were diligent in seeking an otherwise untimely amendment to bring a claim to pierce Defendant's corporate veil.

The dealings between Plaintiffs and Defendant began with the execution of a Cattle Feeding, Finance, and Security Agreement (the "Agreement") in June of 2014, under which Plaintiff Simplot Livestock Co. ("Feedlot") was obligated to feed and care for Defendant Sutfin Land & Livestock's ("SLL") feeder cattle[1] and SLL was obligated to pay Feedlot for the goods and services supplied. Compl. ¶¶ 5–6 (Dkt. 1 p. 10); Agreement ¶¶ 2, 5 (Dkt. 3-2). Feedlot's related company, Plaintiff J.R. Simplot Company ("Simplot"), was also a party to the Agreement. Agreement 1 (Dkt. 3-2). Simplot's role was to finance advances to SLL upon request, conditioned upon Simplot satisfying itself that Defendant was sufficiently creditworthy and met other requirements. *Id.* at ¶ 9. Feedlot claimed a lien upon Defendant's cattle and Defendant granted Simplot a security interest in the cattle and related property. *Id.* at ¶¶ 8, 11. The Agreement specified how proceeds from the sale of Defendant's cattle would be distributed — broadly, Feedlot and Simplot were to be paid in full before Defendant received any proceeds. *Id.* at ¶ 10. Plaintiffs allege in the First Amended Complaint that a substantial deficit remains owing after all of Defendant's cattle were sold and the proceeds applied to pay debts owed under the Agreement to Plaintiffs. First Am. Compl. ¶ 11 (Dkt. 26). More specifically, Plaintiffs allege that Defendant owes them over one million dollars under the Agreement. *Id.* ¶¶ 12–14.

The First Amended Complaint, like the original Complaint, names only SLL as a Defendant. *Id.* at p. 1; Compl. 1 (Dkt. 1 p. 9). SLL is a California corporation. First Am. Compl. ¶ 3 (Dkt. 26); Answer ¶ 2 (Dkt. 27). Notably, Defendant's owners (allegedly Dan, Arthur, and Joan Sutfin) are not named as Defendants in the original Complaint or the First Amended

---

[1] Feeder cattle are weaned steers and heifers placed in a feedlot to be fattened for slaughter.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT – 4**

Complaint. *See* Compl. (Dkt. 1 p. 9); First Am. Compl. (Dkt. 26). The instant motion seeks to add them as additional defendants. Mot. to Amend (Dkt. 28).

Plaintiffs deposed Dan Sutfin ("Dan") on July 19, 2017 under Federal Rule of Civil Procedure 30(b)(6). Mot. to Amend 2 (Dkt. 28). Dan testified that in 2014 he was given a 50% ownership share of SLL by his parents, who each retained a 25% ownership interest. Sutfin Dep. 12:16–25, 25:7–19 (Dkt. 29-1 at pp. 3, 6). He also testified that Defendant did not own any assets used for the cattle operation other than the livestock; his parents owned the real property and equipment used in the business. *Id.* at 15:6–16:13. Dan further testified that Defendant had no money in the bank when it began dealing with Feedlot and that Dan and his parents had each put money into the 300 cattle Defendant owned at that time. *Id.* at 37:17–38:10. Moreover, Dan's living expenses were paid from Defendant's checking account. *Id.* at 21:4–23. He testified that he was not paid a wage or salary; but did receive income from the Defendant's profits. *Id.* at 18:18–19:4. Defendant owned no equipment. *Id.* at 22:23–25. Ultimately, Defendant ceased its cattle business, *Id.* at 19:17–20:13, but Dan later began a new cattle business in his own name using funds he had saved from payments Defendant made to him. *Id.* at 20:14–21:3. Although requested during his deposition, Dan did not produce the Defendant's bank statements. *Id.* at 182:9–183:6.

Plaintiffs' Motion to Amend seeks leave to file a Second Amended Complaint, which would add Dan Sutfin and his parents Arthur Sutfin and Joan Sutfin as defendants, add a claim to pierce SLL's corporate veil, and allege that Dan, Arthur, and Joan Sutfin are alter egos who should also be liable for Plaintiffs' claims against SLL. Mot. to Amend 1–3 (Dkt. 28); *see also* Proposed Second Am. Compl. ¶¶ 4, 5, 26, 27 (Dkt. 28-1). Plaintiffs' motion implies that a claim

to pierce SLL's corporate veil arises because its owners, especially Dan Sutfin, undercapitalized SLL and failed to follow corporate formalities. *See* Mot. to Amend 2–3 (Dkt. 28).

Defendant opposes the motion. It argues that Plaintiffs were not diligent in seeking to add the new claim or parties and that, even if they had been diligent, amendment would be futile. *See generally* Def.'s Resp. to Pls.' Mot. for Leave to Amend Compl. and Extend Deadline for Am. Pleadings for Good Cause (Dkt. 30) ("Def.'s Opp'n"). Defendant contends that Plaintiffs knew or should have known about any alleged undercapitalization of Defendant far earlier than the July 2017 deposition of Dan Sutfin because "Plaintiffs assessed Defendant's ability to pay for losses" prior to entering the Agreement in 2014. *Id.* at 2. Further, Defendant contends, all financing advances made under the Agreement were predicated upon Plaintiff Simplot having first determined Defendant was creditworthy. *Id.* at 2–3; *see also* Agreement ¶ 9 (Dkt. 3-2). Plaintiffs also regularly monitored Defendant's equity position during the term of the Agreement, according to the deposition of Plaintiffs' Rule 30(b)(6) witness. Def.'s Opp'n 3–4 (Dkt. 30) (quoting McNeley Dep. 65:13–66:7 (Dkt. 30-1 at pp. 12–13)). In light of these facts, Defendant concludes that "Plaintiffs cannot credibly claim that they never knew of Defendant's capitalization." *Id.* at 4.

Defendant further points to an email dated September 29, 2015 between two of Plaintiffs' employees as evidence that Plaintiffs were on notice of Defendant's capitalization issues. *Id.* at 6–7. In the email, one employee reported to the other that Defendant could not make a large payment and that Dan [Sutfin] was in jeopardy of going bankrupt, but that Defendant promised to pay the debts owed and would send a payment of over $70,000. *Id.* at 7. Defendant argues this email should have alerted Plaintiffs that they needed to seek discovery on Defendant's capitalization early in the case if they wanted to bring a claim to pierce the corporate veil. *Id.*

Defendant also contends that allowing the amendment would be futile because Plaintiffs cannot prove the elements of a veil-piercing claim.[2] *Id.* at 10–13 (Dkt. 30). Defendant's briefing on this issue emphasizes Defendant's position that treating Defendant as a separate entity from the individual Sutfins would not sanction a fraud or promote injustice, as required by the second element of a veil-piercing claim. *Id.* According to Defendant, Plaintiffs carefully monitored its creditworthiness and controlled its capitalization through the Agreement. *Id.* at 11. Therefore, Defendant contends that Plaintiffs' corporate veil claim is simply an attempt either to redefine creditworthiness retrospectively or to seek to avoid the consequences of Plaintiffs' own failure to adequately evaluate Defendant's creditworthiness during the term of the Agreement. *Id.* at 12–13. Either way, according to Defendant, Plaintiffs cannot meet the elements of the claim. *Id.* at 13.

Plaintiffs argue that they were diligent enough, in that they had no notice of the potential need to pierce the corporate veil until they deposed Dan Sutfin on July 19, 2017. Mot. to Amend 2 (Dkt. 28). Plaintiffs acknowledge that they could have deposed Dan earlier, but they state the taking of the deposition was within the scheduling order deadline and that it was a standard litigation strategy decision to defer deposing opposing parties until other discovery is largely completed. Further (and Plaintiffs contend more relevant to the issues in their motion), they dispute that they knew or should have known that Defendant was undercapitalized prior to the July 2017 Sutfin deposition. Although written discovery requests could have sought information that might earlier have raised a potential veil-piercing claim, Plaintiffs contend that there was no

---

[2] Additionally, Defendant argues the amendment would be futile because only one of the two Plaintiffs has a damages claim against Defendant, but this argument fails at the outset because it does not apply to every Plaintiff.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT – 7**

reason to propound any such discovery because they had no reason to suspect the corporation was undercapitalized.

Plaintiffs further argued at the hearing that the September 2015 email showed Defendant had cash-flow issues as of that single date, but that was an isolated instance where Defendant could not pay. That fact, however, was coupled with evidence of a promise to pay in full eventually and therefore, according to Plaintiffs, did not provide notice of persistent undercapitalization issues. Without any reason to believe there were ongoing capitalization issues, Plaintiffs assert, they had no notice of a potential veil-piercing claim.

Instead, Plaintiffs contend it was only recently discovered information that raised the specter of undercapitalization. Plaintiffs say that they learned for the first time several months after the deposition of Dan Sutfin that he wrote a check to himself from the Defendant's checking account for $100,000.00 in December of 2015, just two months before Plaintiffs filed suit in this matter. Pls.' Reply in Supp. of Mot. for Leave to Amend Compl. 4–5 (Dkt. 34) ("Pls.' Reply"). Although the memo line of the check indicates it is for "year end wages," Plaintiffs point to Dan's deposition testimony that Defendant did not pay him a wage, but instead he received a share of profits. *Id.*; Sutfin Dep. 18:20–19:4 (Dkt. 29-1 at p. 5). In that context, Plaintiffs contend that there is evidence that "shareholder Dan Sutfin looted the corporation." Pls.' Reply 34 (Dkt. 34).

This is a close case. Plaintiffs' newly-discovered evidence certainly supports a veil-piercing claim. But the threshold question is when Plaintiffs first knew or should have known of the potential claim. Plaintiffs assert that it wasn't until Dan Sutfin's July 19, 2017 deposition that they received information establishing a basis to allege a veil-piercing claim. Mot. to Amend. 2

(Dkt. 28). The Court disagrees. Plaintiffs knew or should have known of the claim no later than the September 2015 email, which was sent prior to suit being filed.

A closer look at the email shows why this is so. In its entirety, the email states:

> I talk[ed] to Art Sutfin and he said they would pay the loss as they [accrue]. I ask[ed] for a large injection of cash and he said that would be hard to do and he did not want Dan to go bankrupt[] and no one gets paid. He promised to pay all debt but hope[s] the market will move a little in their favor. Said they will send $70290.00 to clear u[p] this set. What else do you want me to do.

Def.'s Resp. 7 (Dkt. 30) (quoting Ex. 2 to Decl. of Defs.' Counsel, Sept. 29, 2015, Simplot Email produced by Simplot as Bates No. SIMPLOT 354923). Aside from the obvious fact that the email indicates, at the least, that Defendant was experiencing financial difficulty in the face of an apparently unexpected downturn in the feeder market, three additional points stand out. First, the email indicates Art said "they" would pay losses as they accrue and "they" will send a payment now, without identifying who "they" are. Because the contracting party was SLL — a single entity — use of the plural "they" could only have referred to the family members Art, his wife Joan, and their son Dan. Second, the email makes mention of Art raising the possibility of Dan — but not SLL, and not Art or Joan — going bankrupt. Thus, the email speaks directly to the financial condition of one of SLL's individual owners (and the owner most directly responsible for the running of the business). Third, the email states "[h]e promised to pay all debt," again without clearly identifying to whom the pronoun refers. From context, it is Art Sutfin to whom the email refers, although it is conceivable it could refer instead to Dan. But it is not SLL, a corporate entity, to which the email refers.

Closely held companies often are operated in a manner in which the business is most identified with the individuals who own the business — *e.g.*, an owner saying "I'll take care of that" as distinct from saying "the corporation will take care of that." But that circumstance cuts

against Plaintiffs' request here, as Plaintiffs must have been aware of the closely held nature of SLL from the fact of Plaintiffs' interactions with SLL over the course of their multi-year business relationship and from the financial information that SLL was required to provide which Plaintiffs reviewed on an ongoing basis. Plaintiffs perhaps gave no particular importance to the questions of whether SLL and its principals were careful about maintaining corporate formalities and sufficient capitalization, or whether the business was being run like a proprietorship, when the feeder market was doing well by all. But those questions became immediately important when the feeder market cratered and the ability of SLL to pay its obligations to Plaintiffs came into question. Hence, in the context of the information available to Plaintiffs at the time of the email about whether the large debt would (or could) be paid, and the obvious possibility that a closely held family corporation struggling to pay its debts might well *not* be adequately capitalized, it is inescapable that Plaintiffs were on notice that some factual investigation and/or litigation discovery into that subject was called for. This also encompassed the potential need to include, or amend an already filed complaint to add, an alter ego/veil piercing claim.

      Plaintiffs' counsel admitted at the hearing on this motion that Plaintiffs could have directed written discovery to inquire how the corporation was capitalized. Such discovery was not viewed as needed or appropriate. But, as Defendant's counsel argued at the hearing, when Dan was deposed many months later, Plaintiffs' counsel asked targeted questions focusing on Defendant's capitalization. Thus, Defendant asserted, Plaintiff had some reason to be concerned about capitalization, and therefore notice of a potential veil-piercing claim, even before Dan's deposition testimony was elicited. Although it is not clear when Plaintiffs developed this concern, Plaintiffs had sufficient information to have raised concerns prior to the deadline to amend their pleadings. This is especially so given the context of the Agreement, under which

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT – 10**

Plaintiffs had the right to continually evaluate Defendant's creditworthiness and monitor Plaintiffs' equity position in the feeder cattle placed by Plaintiffs in the Grandview feedlots.

The Court has considered counsel's arguments that litigation efficiencies are an understandable explanation for the late decision to pursue a corporate veil claim. If this were a different case, Plaintiffs' conscious decision not to seek tax returns, bank statements, or other corporate documents in written or other discovery would be sensible and entirely consistent with the modern requirements of proportionality in discovery. Moreover, it is not unusual (but also not required) to defer taking Rule 30(b)(6) depositions until at or near the end of document production. But in this case, Plaintiffs were on notice that Defendant was experiencing financial difficulties even before filing suit, and Plaintiffs could properly have inquired into the circumstances surrounding those difficulties much sooner, particularly with the details of what they already knew about Defendant's financial condition. Had they done so, they could have sought to amend to add a veil-piercing claim in a timely fashion.

As discussed at the outset, *Johnson* requires that an untimely motion to amend be supported by good cause, which cannot be shown if the moving party was not diligent. 975 F.2d at 608–609. *Johnson* also acknowledges the broad discretion the district court holds with respect to pretrial orders and their preclusive effect. *Id.* at 607. In exercising that discretion, the Court concludes that the context of Plaintiffs' motion to amend does not allow for a showing of good cause. Plaintiffs could have and should have explored earlier whether a claim to pierce Defendant's corporate veil might be proper. The reasons put forward simply do not demonstrate good cause for not seeking to amend before the deadline established by the Court's scheduling order.

Further, despite Plaintiffs' argument to the contrary, Defendant would suffer prejudice by an amendment at this stage of an already lengthy lawsuit. The Court need not consider prejudice if Rule 16(b) is not satisfied. *Johnson*, 975 F.2d at 607. But "the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion." *Id.* at 609. Here, the parties are nearly two years into a document-intensive case that has reportedly already involved thousands of pages of discovery. Discovery is now closed. The case is ripe for trial.[3] Granting Plaintiffs' motion would necessitate reopening discovery and potentially reopening motion deadlines, which would delay the proceedings. The Court finds this would prejudice Defendant. *See Solomon v. N. Am. Life and Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (affirming the district court's denial of a motion to amend filed on the eve of the discovery deadline because it would cause undue delay and prejudice).

For the foregoing reasons, the Court concludes that Plaintiffs were not reasonably diligent in bringing the instant motion. Therefore, the Court concludes the motion is not supported by good cause under Rule 16. Further, granting the motion would cause undue delay and prejudice. Accordingly, the motion is denied.[4]

\\

\\

\\

\\

\\

---

[3] The Court notes, however, that there are ripe pre-trial motions, including cross-motions for summary judgment at Docket Nos. 31 and 33. These will be taken up in due course.

[4] Because the Court is denying the motion on the basis that Plaintiffs were not reasonably diligent, it need not, and does not, address whether the amendment would be futile.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT – 12**

# ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Leave to Amend Complaint and Extend the Deadline to Amend Pleadings for Good Cause (Dkt. 28) is **DENIED**.



DATED:  **January 25, 2018.**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge