## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| SIMPLOT LIVESTOCK CO., et al, | Case No.: 1:16-cv-00139-EJL-REB |
| Plaintiffs, | |
| vs. | **REPORT AND RECOMMENDATION RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKTS. 31, 33)** |
| SUTFIN LAND & LIVESTOCK, | |
| Defendant, | |
| AND RELATED ACTIONS. | |

Pending are Plaintiffs' Motion for Summary Judgment (Dkt. 31) and Defendant's Motion for Partial Summary Judgment (Dkt. 33). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Report and Recommendation.

## **BACKGROUND**

Plaintiffs Simplot Livestock Co. ("Feedlot") and J.R. Simplot Company ("Simplot") brought this suit to recover amounts allegedly owed by Defendant Sutfin Land & Livestock ("Sutfin") under a "Cattle Feeding, Finance, and Security Agreement" (the "Agreement") dated as of June 9, 2014. FAC ¶ 5 (Dkt. 26).[1] The Agreement called for Sutfin to deliver cattle to Feedlot, which would feed and care for the cattle until they were "finished" – that is, ready to sell as matured and fattened. Agreement ¶¶ 1, 2, 10 (Dkt. 31-3). Under the Agreement, Simplot could make financing advances to Sutfin for the cost of finishing the cattle up to the amount of the market value of cattle, less an amount of minimum equity. *Id.* ¶ 9. Such financing advances

---

[1] The Agreement is found at Exhibit 1 to the McNeley Declaration, Dkt. 31-3 pp. 8–20.

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 1**

would be used to pay Feedlot's charges for feeding and caring for the cattle. *Id.* ¶¶ 5, 6, 9.

Between June 2014 and August 2015, Sutfin delivered 76 lots of cattle to Feedlot. Mem. ISO Plfs.' MSJ 2 (Dkt. 31-2). In 2015, the previously profitable cattle market went into a dive. Sutfin's equity in the cattle in Feedlot's possession was wiped out. *Id.* Feedlot and Simplot demanded that Sutfin pay amounts alleged to be owed under the Agreement. When payment was not made, Feedlot and Simplot filed this lawsuit alleging that Sutfin owes Plaintiffs $1,041,119.21 for services provided under the Agreement. FAC ¶ 14 (Dkt. 26). Sutfin counterclaimed against Feedlot and Simplot, alleging breach of contract, breach of fiduciary duty, violation of the Idaho Consumer Protection Act, and negligence.[2] *See generally* Ans., Countercl., Third-Party Compl. (Dkt. 3) ("Countercl.").

In the pending motions, Plaintiffs seek to recover the alleged amount owed and obtain dismissal of Sutfin's counterclaims. Plfs.' MSJ 1 (Dkt. 31). Sutfin seeks dismissal of Feedlot's claims in their entirety; dismissal of Simplot's claim for breach of the covenant of good faith and fair dealing; partial summary judgment that Simplot failed to mitigate its damages, and partial summary judgment that Plaintiffs are liable to Sutfin on claims for breach of contract, breach of fiduciary duty, and negligence. Def.'s MPSJ 2 (Dkt. 33).

## **LEGAL STANDARD**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). One of the principal purposes of summary

---

[2] Sutfin also named Simplot Land & Livestock as a third-party defendant in its counterclaim. Simplot Land & Livestock is an entity related to Feedlot and Simplot. Sutfin did not name each entity as a counterdefendant/third-party defendant as to each claim. The precise positioning of each party as to each claim is not significant to this Report and Recommendation except where noted.

judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any *material* fact — a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). However, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by [his] own affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 3**

U.S. at 324. Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

## REPORT

### 1. Analysis of Plaintiffs' Motion for Summary Judgment

Plaintiffs contend the Agreement is clear, unambiguous, and imposes upon Sutfin duties that, the evidence shows, Sutfin did not fulfill. They further contend that the alleged dollar amount owed is not disputed. As to Sutfin's counterclaims, Plaintiffs argue that each claim is factually or legally deficient. Each request for relief will be considered in turn.

### A. Plaintiffs' Motion for Summary Judgment Should Be Denied as to Plaintiffs' Contract Claim.

Plaintiffs seek $1,041,119.21 on their claims, contending that the Agreement is "complete, unambiguous and is enforceable according to its terms" and the amount sought is not disputed. Plfs.' MSJ 1 (Dkt. 31); Plfs.' Mem. ISO MSJ 5 (Dkt. 32-2); Plfs.' Statement of Material Facts ¶ 15 (Dkt. 31-1) (citing Sutfin Depo. pp. 120:1–14, 158:14–159:3 (Dkt. 31-4)).

Sutfin responds that Plaintiff Feedlot (as distinct from Plaintiff Simplot) has no claim to damages because any amount owed for financing is owed exclusively to Simplot.[3] Def.'s Resp. to Plfs.' MSJ 6 (Dkt. 39). And, even though Sutfin admits it was in default under the

---

[3] As stated earlier, Sutfin separately moves to dismiss Feedlot as a Plaintiff.

Agreement,[4] it contends that Simplot "had the ability to mitigate 100% of [its] damages caused by the default" and failed to do so. Def.'s Mem. ISO MPSJ 2 (Dkt. 33-1). Sutfin argues:

> In late summer 2015, Simplot was aware that Sutfin owed Simplot for advanced financing; Simplot was aware that Sutfin had failed to enter into purchase addendums to stop its losses; that Sutfin no longer could stop its losses; and that there was a significant risk to Simplot that Sutfin would not have enough money in its portfolio to pay Simplot back. At that point in time, Simplot determined Sutfin was in default and Simplot chose to manage its own risk in an attempt to avoid or lessen damages to Simplot. But, instead of locking in the safe bet that would have ensured that Sutfin's portfolio would, in fact, satisfy the advanced financing debt owed to Simplot, Simplot chose to gamble on the market. Specifically, Simplot could have forward-sold Sutfin's cattle to lock in the price that would have been sufficient to cover the debt due. But Simplot chose to bet on the market, hoping the market would stay the same and cover financing due, or that the market would go up so the portfolio would cover debt owed, plus make Sutfin money. Simplot chose an unreasonably risky approach to managing losses instead of a choosing an approach certain to eliminate loss. As a result, Simplot's damages are far more than they otherwise would be and none of the losses should be recoverable.

*Id.* at 7–8.

In response, Simplot argues that it had no duty to mitigate, and, alternatively, that it did take reasonable measures to minimize damages. Plfs.' Resp. to Def.'s MPSJ 5–8 (Dkt. 36). Simplot cites *Davis v. First Interstate Bank of Idaho, N.A.*, 765 P.2d 680, 682 (1988), for the proposition that there is no duty to mitigate damages where the debtor gives assurances of payment. In *Davis*, the defendant bank breached a contract by failing to lend the plaintiff sheep ranchers money. The ranchers sued the bank, alleging the breach resulted in starved, malnourished sheep. The trial court granted the bank summary judgment, holding that the ranchers failed to mitigate damages. On review, the Idaho Supreme Court addressed both whether the ranchers had properly mitigated and whether a duty to mitigate even existed. The Court sided with the ranchers on both issues. First, the Court held the ranchers had demonstrated

---

[4] The parties' competing motions for summary judgment were filed on the same day and included overlapping argument. Both motions were heard at the same hearing.

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 5**

a genuine dispute of material fact by citing evidence the ranchers sought (but did not receive) alternative financing from two other lenders. Second, again citing record evidence, the Court held that the bank's assurances to the ranchers "that the sheep would be cared for on a day to day basis" created a genuine issue of material fact as to whether the ranchers had a duty to mitigate: "If the ultimate trier of fact should determine the bank assured plaintiffs that the sheep would be cared for, no duty to mitigate would arise." *Id.* Thus, it is a question of fact whether a defendant has provided assurances sufficient to excuse a duty to mitigate.

Simplot contends that Arthur Sutfin, one of the owners of Sutfin, gave assurances in September 2015 that losses would be paid as they came due and that Sutfin "promised to pay all debt." Plfs.' Resp. to Def.'s MPSJ 6 (Dkt. 36) (citing McNeley Suppl. Decl. ¶ 5 (Dkt. 36-2)). Under such circumstances, Simplot argues, it was under no duty to mitigate. However, the evidence Simplot cites is an email sent by one employee to another employee describing a telephone conversation with Mr. Sutfin. Although the email includes references to payment, it also says that Sutfin did not want to pay "a large injection of cash"[5] and was hoping "the market will move a little in their favor." Additionally, Plaintiffs admit that "[t]he significant drop in cattle market prices between August and October 2015 caused Sutfin's later [cattle shipment] lots to incur substantial losses after application of the sale proceeds to the outstanding principal, interest, and feed bills." Plfs.' Resp. to Def.'s MPSJ 5–6 (Dkt. 36). In light of the market downturn, there is room for inference that the representations by Arthur Sutfin were not sufficient "assurances" to excuse Plaintiffs' duty to mitigate. Hence, although raising an issue of

---

[5] The email also indicates that Sutfin would pay $70,290 "to clear up this set," which it did. Plaintiffs do not say how much Sutfin owed at the time, so the Court cannot evaluate how this payment relates to Sutfin's hesitance to pay "a large injection of cash."

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 6**

fact as to whether the duty to mitigate was excused, the evidence does not establish as a matter of law that it was excused. That will be for the jury to determine.

Significantly, the Agreement placed duties upon Sutfin and gave protection to Simplot in circumstances such as transpired in the feeder cattle market in the summer and fall of 2015. Sutfin was required to maintain a minimum amount of equity per head in the cattle, with Sutfin's equity to be calculated by Simplot based on the market value of the cattle and the cost of finishing the cattle through to market. Agreement ¶ 9(a) (Dkt. 31-3). If a particular lot of cattle had too little equity, Sutfin was required to restore the equity level by paying down the outstanding balance of any advances received. *Id.* ¶ 9(b). In the event Sutfin "fail[ed] to pay or perform its obligations as and when the same are due, or otherwise fail[ed] to comply with the terms and provisions of th[e] Agreement," Feedlot was authorized to sell enough of Sutfin's cattle to satisfy any outstanding obligations. *Id.* ¶ 14.

Additionally, the Agreement allowed Sutfin to "hedge" its risk against market downturn prior to the cattle being finished by setting a guaranteed price for a specific lot of finished cattle via a "purchase" addendum to the Agreement. (Dkt. 31-3 pp. 18–20.) Under the purchase addendum, Feedlot would purchase the cattle and "to manage risk and protect Feedlot's position … Feedlot will engage in hedging activity in the futures and/or options market." *Id.* ¶ 4. Sutfin hedged all 27 lots shipped to Feedlot from June 2014 through November 2014, but it did not hedge the remaining 49 lots shipped from November 2014 through August 2015. Plfs.' Statement of Material Facts ¶ 18 (Dkt. 31-1).

Thus, if Sutfin's equity fell below the threshold required by the Agreement, Plaintiffs had the right to sell some or all of Sutfin's cattle before they were finished for sale, to ensure payment of amounts owed by Sutfin under the Agreement. Plaintiffs say they considered doing

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 7**

so, but decided that "[t]o immediately sell the immature cattle off, in response to the market price drop, would have increased the losses to Sutfin." Plfs.' Resp. to Def.'s MPSJ 7 (Dkt. 36). But that argument presumes that the market prices after that date would increase, or at least stabilize. Hence, at a minimum, these circumstances show a genuine issue of fact about whether the Plaintiffs' decision not to sell the immature cattle was reasonable. Further, Plaintiffs do not support their argument with firm numbers about cattle prices or potential losses. They suggest that their decision "to proceed under the terms of the Cattle Feeding Agreement in providing feed and care to the cattle to reach maturity before selling on the market was a commercially reasonable decision." *Id.* at 8. That is certainly an argument they can make at trial, but on the present record applying summary judgment standards, the Court cannot make that ruling as a matter of law. Accordingly, it is recommended that Plaintiffs' motion for summary judgment be denied with respect to its contract claim.

### B. Plaintiffs' Motion for Summary Judgment Should Be Granted as to Count One of Sutfin's Counterclaim.

Sutfin's counterclaim contains two breach of contract counts. Countercl. ¶¶ 29–49 (Dkt. 3). Count One alleges Plaintiff Feedlot and Third-Party Defendant Simplot Land & Livestock[6] breached the Agreement by removing certain of Sutfin's cattle from the feedlot without consulting Sutfin. *Id.* ¶¶ 35–36. Count Two alleges Plaintiff Simplot and Third-Party Defendant Simplot Land & Livestock breached the Agreement by making excessive advances to Sutfin. *Id.* ¶¶ 45–47. Both counts also allege, separately, that Plaintiffs breached the Agreement by failing

---

[6] Sutfin alleges Simplot Land & Livestock is "an unincorporated association doing business in the state of Idaho and beyond, independently and/or as an agent and/or unregistered D/B/A of one or more of the Plaintiffs/Counterdefendants." Countercl. ¶ 4 (Dkt. 3). Plaintiffs admit that Simplot Land & Livestock is a dba of Feedlot. Ans. ¶ 4 (Dkt. 5). Where appropriate, references in this report and recommendation to "Plaintiffs" include Third-Party Defendant Simplot Land & Livestock.

to provide timely profit/loss projections that would have assisted Sutfin in deciding whether to hedge certain lots. *Id.* ¶¶ 31–34, 41–44.

Plaintiffs contend that for any cattle sold prior to Sutfin's default, Sutfin received a profit for the cattle and has no claim for resulting damages. Further, Plaintiffs say that the consultation requirement did not apply to cattle sold after Sutfin's default. Mem. ISO Plfs.' MSJ 8 (Dkt. 31-2). Finally, Plaintiffs challenge whether Sutfin has put forward evidence of any damages whatsoever.

Sutfin seeks damages "including loss of equity and profits, and increased costs" stemming from Plaintiffs' alleged failure to consult with Sutfin prior to removing Sutfin's cattle from the feedlot. Countercl. ¶ 36 (Dkt. 3). Lost profits are recognized contract damages. *See, e.g., Saint Alphonsus Diversified Care, Inc. v. MRI Associates*, LLP, 334 P.3d 780 (Idaho 2014). Although Sutfin does not brief the point, its Counterclaim alleges that "Sutfin was prohibited from determining the best timeframe for delivery, slaughter, and sale of the "finished" cattle. As a result, Sutfin was injured and incurred damages, including loss of equity and profits, and increased costs." Countercl. ¶ 36 (Dkt. 3). These allegations were sufficient to state a claim for relief; however, the fact that Sutfin is entitled to claim such damages and has sufficiently pled a claim for such damages is not prima facie evidence that it incurred such damages. When challenged on summary judgment, it is Sutfin's burden to provide that prima facie evidence. The Court has reviewed all of Sutfin's relevant filings, including its response to Plaintiffs' motion for summary judgment (Dkt. 39) and its materials in support of its own motion for partial summary judgment (Dkts. 33, 33–1 through 33–7, and 40). Nowhere does Sutfin point to evidence of lost profits as a result of Plaintiffs selling Sutfin's cattle prematurely. It argues in its response to Plaintiffs' motion (at Dkt. 39 p. 7) that it "lost a substantial sum as a result" of Plaintiffs' alleged

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 9**

breaches, but the record contains no evidence relied upon by Sutfin to identify dates of sale, numbers of cattle, prices of sale, reconciliation calculations, or any other specific evidence of alleged lost profits.

Accordingly, it is recommended that summary judgment be entered in Plaintiffs' favor on Count One of Sutfin's Counterclaim.

### C. Plaintiffs' Motion for Summary Judgment Should Be Denied as to Count Two of Sutfin's Counterclaim.

Sutfin alleges in Count Two that Simplot breached the Agreement by making excessive advances to Sutfin. Countercl. ¶¶ 46–48 (Dkt. 3). The Agreement allowed Simplot to make advances "up to the amount of the market value of the Cattle as established by Simplot less the minimum amount of equity required." Agreement ¶ 9 (Dkt. 31-3). It also allowed Simplot to make advances to Feedlot for Sutfin's benefit, although it specified that "[t]he aggregate amount of Advances … shall not exceed the sum" of those two types of permitted advances. *Id.* Simplot was not obligated to make advances unless Sutfin met express "conditions to the satisfaction of Simplot, in Simplot's sole discretion." *Id.* at ¶ 9(a).

Plaintiffs contend that Simplot alone could choose whether to make advances to Sutfin and, therefore, Sutfin could not have been damaged by the advances. Mem. ISO Plfs.' MSJ 9–10 (Dkt. 31-2). However, the fact that Simplot could make such decisions unilaterally does not mean that Sutfin was not, or could not have been, damaged by any alleged excess advances. In other words, the discretion – even if unilateral – was subject to constraints under the terms of the Agreement. Simplot was constrained in that it could make advances only "up to the amount of the market value of the Cattle as established by Simplot less the minimum amount of equity required" or "for the benefit of [Sutfin] to pay [Sutfin's] obligations to Feedlot under this Agreement." Agreement ¶ 9 (Dkt. 31-3). Further, "[t]he aggregate amount of Advances … shall

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 10**

not exceed the sum" of those two types of advances. *Id.* Simplot was not obligated to make advances unless Sutfin met express "conditions to the satisfaction of Simplot in its sole discretion." *Id.*

Notably, the information relevant to the advances – that is the amounts, the circumstances of each instance when such an advance was made (in particular, the equity value of the cattle), and the details as to the hedging decision -- were largely, and sometimes exclusively in the hands of Plaintiffs. Sutfin's counterclaim here calls into question the attention paid (or lack thereof) to such matters and to the decisions made. Sutfin also implies that excessive advances induced it to believe that it was within the Agreement's equity requirements. If Simplot had stopped making advances while Sutfin was in default, Sutfin could have delayed or stopped delivering more cattle to Feedlot – and thereby avoided incurring additional costs and losses. In that setting, the Court is persuaded that there are genuine issues of material fact. The Court acknowledges that the evidence put forward by Sutfin in opposing summary judgment on this counterclaim is sparse. However, unlike the counterclaim seeking lost profits on Sutfin's cattle that were sold by Plaintiffs before they were finished – as to which the evidence could have been marshaled, if it existed, to support the lost profit claim – the claim alleging that Simplot made excessive advances and thereby increased the amount Sutfin allegedly owed is in the hands of Simplot and whether Sutfin has been able to find support for his position in discovery is not at issue here when the circumstantial evidence and argument is sufficient to overcome summary judgment.[7]

Accordingly, it is recommended that Plaintiffs' motion for summary judgment be denied as to Count Two of Sutfin's Counterclaim.

---

[7] Sutfin has challenged the validity of the advances that were made based upon those limitations, contending that Plaintiffs "advance[d] more financing than equity requirements could pay." Def.'s Resp. to Plfs.' MSJ 7–8 (Dkt. 39).

**D.  Plaintiffs' Motion for Summary Judgment Should Be Denied as to Sutfin's Contract Claim Alleging a Contractual Duty to Provide Profit/Loss Projections to Sutfin.**

In each of its breach of contract claims, Sutfin also alleges that Plaintiffs were obligated to provide timely profit/loss projections (referred to as "break-evens") and that they breached the Agreement by failing to provide such projections. Countercl. ¶¶ 31–34, 41–44 (Dkt. 3). Sutfin acknowledges that the Agreement does not expressly include such a requirement; however, Sutfin contends that such a term should be implied or, alternatively, the parties' course of conduct effectively modified the contract to add such a requirement after Plaintiffs provided break-evens to Sutfin. Def.'s Resp. to Plfs.' MSJ 9–10 (Dkt. 39).

Feedlot was to furnish Sutfin a monthly statement of account, which Sutfin could pay via advances from Simplot – but only if Simplot determined that Sutfin had adequate equity based on the current price of cattle. Thus, Simplot needed to assess both the market value of cattle and Sutfin's equity in its cattle on feed at Feedlot on at least a monthly basis. The testimony of Simplot's Rule 30(b)(6) deponent shows that these assessments are what the parties referred to as the break-evens:

> Q.  So nobody is watching those break-even's on an ongoing basis?
> A.  No, that is not a fair statement. So as the market changes we would be updating those break-even's. Particularly in the case of finance cattle. We would be monitoring, you know, what that continual equity basis would be.
> Q.  And why is that?
> A.  Because – especially in the case where we had financed cattle. That is a measure of that customer's ability to repay the loan.
> Q.  You said you are looking for a certain amount of equity in cattle?
> A.  Correct.
> Q.  And that is being monitored on an ongoing basis?
> A.  Correct.
> Q.  And is that something that Simplot Livestock is doing on behalf of J.R. Simplot Company?
> A.  That would be correct.

McNeley Dep. pp. 65:13–66:7 (Dkt. 33-4).

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 12**

Even though Plaintiffs argue that nothing in the Agreement required it to send such projections (Plfs.' Resp. to Def.'s MPSJ 15 (Dkt. 36)), the Agreement discusses in detail the Plaintiffs' disclaimers from potential liability in making such projections, *i.e.*:

> Any and all projections or estimates of performance provided by Feedlot to Owner with respect to Feedlot's feeding program are estimates only and contain forward looking statements that involve certain risks, uncertainties and assumptions. These risks, uncertainties and assumptions include, but are not limited to, market factors and general economic conditions, many of which are beyond the control of Feedlot and Simplot. Feedlot's estimates and projections are made in good faith and are believed by Feedlot to have a reasonable basis, but there can be no assurance that Feedlot's estimates and projections will result or be achieved or accomplished, and actual results may vary materially from any estimates or projections provided by Feedlot. Owner hereby acknowledges and agrees that any projections or estimates are not a guarantee of performance.

Agreement ¶ 18(a) (Dkt. 31-3). Such disclaimers would not be needed but for the fact that the other duties and obligations described in the Agreement could only be calculated and determined from such projections. Indeed, Feedlot provided projections to Sutfin on numerous occasions between June 2014 and November 2014. Def.'s Resp. to Plfs.' MSJ 9 (Dkt. 39).

The Agreement also gave Sutfin the right to "inspect records pertaining to the Cattle at any time, upon reasonable notice, during ordinary business hours." Agreement ¶ 4 (Dkt. 31-3). Feedlot was required to provide Sutfin "a monthly statement of charges for feed, supplies and services rendered." *Id.* ¶ 6. Sutfin was to pay such charges either directly or with advances from Simplot within 20 days. *Id.* For any advances under the Agreement (whether to pay the monthly charges or otherwise), Simplot required certain conditions to be fulfilled. *Id.* ¶ 9. Among these conditions was a requirement that Sutfin's cattle have least $200 equity per head of cattle for unhedged lots and $150 equity per head for hedged lots. *Id.* Significantly, "equity" under the Agreement was defined as "the market value of the Cattle *as established by Simplot* less the

aggregate amount of Advances." *Id.* (emphasis added). It is undisputed that Simplot made numerous advances to Sutfin under the Agreement.

Hence, much of the Agreement was tied to the present value of the cattle. Moreover, the Agreement acknowledges in paragraph 18(a) that Feedlot would communicate such analyses to Sutfin. Thus, (1) the Agreement required Plaintiffs to provide monthly statements; (2) such statements could only be paid with advances if Plaintiffs were monitoring cattle prices and Sutfin's equity; and (3) the Agreement expressly anticipated that Feedlot would provide "projections or estimates" to Sutfin. Even though it is apparent that the process of preparing break-evens was necessarily intertwined with making equity evaluations and calculating the amounts of advances to be paid under the Agreement, the record is unclear as to how Plaintiffs were to provide such information to Sutfin. Under these circumstances, there is a genuine issue of material fact whether the Agreement required Plaintiffs to provide Sutfin break-evens. Hence, it is recommended that Plaintiffs' motion for summary judgment be denied on this issue.

**E. Plaintiffs' Motion for Summary Judgment Should Be Granted as to Count Three of Sutfin's Counterclaim.**

Sutfin alleges that Plaintiffs owed it a fiduciary duty, which was breached. Countercl. ¶¶ 50–59 (Dkt. 3). Sutfin alleges that it was more of a partner in an investment with Plaintiffs than it was a debtor to a creditor. *Id.* ¶ 51. Further, Sutfin contends Plaintiffs were in a position of "special trust and confidence" with special duties owed to Sutfin. *Id.* ¶ 52.

Plaintiffs argue that Idaho law does not allow for such a claim, because "no fiduciary duty ordinarily arises between parties to an arm's length business transaction." Mem. ISO Plfs.' MSJ 11 (Dkt. 31-2) (quoting *High Valley Concrete, LLC v. Sargent*, 234 P.3d 747 (Idaho 2010)). Here, Plaintiffs contend, the Agreement was an arm's length transaction between entities of

equal bargaining power, and without any special relationship that would impose fiduciary obligations. *Id.* Moreover, they point out, Sutfin expressly "acknowledge[d] and agree[d] that the cattle industry is inherently risky" and agreed that it was "aware of the risks involved in cattle feeding, and assume[d] and agree[d] to bear all such risks." Agreement ¶ 18(b) (Dkt. 31-3).

"A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence." *Stearns v. Williams*, 240 P.2d 833, 840–841 (Idaho 1952). "The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him." *High Valley Concrete*, 234 P.3d at 752. "The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Id.*

Here, Sutfin contends that Plaintiffs had the unilateral ability to define Sutfin's equity position in its cattle and that they were "the only parties continually watching Sutfin's equity position in its cattle on a continual basis." Def.'s Mem. ISO MPSJ 19 (Dkt. 33-1). Sutfin frames Plaintiffs as having a superior position over Sutfin, resulting in Sutfin placing special confidence in Plaintiffs. *Id.* But these allegations, without more, do not establish a prima facie case that Plaintiffs were Sutfin's fiduciaries. Even if Plaintiffs have a large presence in the cattle future markets, that market has many large and small players, all of whom have access to information about the market upon which to make decisions about getting in and getting out. The Sutfin family members may have believed that doing business with Plaintiffs enhanced their opportunity to profit in the feeder cattle market. But the fact that the Sutfins hoped that Plaintiffs

might have more experience in the market and a greater market knowledge, and that such experience and knowledge might work to Sutfin's benefit, does not convert an otherwise straightforward contract for finishing feeder cattle and putting them into the slaughter market into a fiduciary relationship.

Although such language alone would not be dispositive of the issue, the Agreement does expressly disclaim liability upon Plaintiffs for market risk and it makes clear that Sutfin takes such risk. With that language and the other facts of this record, the Court is persuaded as a matter of law that Plaintiffs did not owe fiduciary duties to Sutfin. Accordingly, it is recommended that Count Three of Sutfin's Counterclaim be dismissed.

**F. Plaintiffs' Motion for Summary Judgment Should Be Granted as to Count Four of Sutfin's Counterclaim.**

Sutfin contends that Plaintiffs violated the Idaho Consumer Protection Act ("ICPA") by engaging in unlawful and deceptive acts or practices in trade or commerce. Countercl. ¶¶ 60–77 (Dkt. 3). Specifically, Sutfin argues Plaintiffs violated Idaho Code § 48-603 by engaging in "acts or practices that cause likelihood of confusions or misunderstanding of goods or services; misrepresenting goods or services or qualifications to provide the same; advertising services with the intent of not selling them as advertised; obtaining signatures to contracts that contain blanks to be filled in later; and engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." Def.'s Resp. to Plfs.' MSJ 11 (Dkt. 39); Countercl. ¶¶ 70–71 (Dkt. 3).

Plaintiffs argue that the Counterclaim gives no notice of a particular claim, nor does it point to any evidence to support a claim. Mem. ISO Plfs.' MSJ 12–13 (Dkt. 31-2). Sutfin responds by offering specific examples of Plaintiffs' conduct that it alleges violate the ICPA:

In this case, Simplot and Simplot Feedlot repeatedly engaged in conduct made unlawful by the ICPA including: having Sutfin sign contracts with blanks that would later be filled in by Simplot; advertising their services as providing "break-even analysis" and "risk management" in their brochure intended to attract customers with no intention of providing such services as advertised; advertising that Plaintiffs are "Partners with Investors" when Plaintiffs never intended a partnership with Sutfin; leading Sutfin to believe that Plaintiffs were watching the market and advising Sutfin when, apparently, Plaintiffs were not intending to provide such services, as evidenced by the abrupt cessation of such services without warning; using a Purchase Addendum that is excessively one-sided, and which, contrary to Plaintiffs' assertions, only pretends to change ownership of cattle and only pretends to shift risk to Simplot Livestock when, in reality, ownership is not transferred until after hedging activity takes place and risk is never shifted to Simplot Livestock; and having Sutfin enter into Purchase Addendums that reference dates of Feeding and Finance Agreements that do not exist.

Def.'s Resp. to Plfs.' MSJ 11–13 (Dkt. 39) (footnotes omitted).[8]

In response, Plaintiffs point out that Idaho Code § 48-608(1) requires an "ascertainable loss" as a result of methods or practices prohibited under the ICPA, and they contend that Sutfin has not suffered damage from any of the Purchase Addenda it actually executed. Because the primary remedies available under Idaho Code § 48-608 are either treating the agreement as voidable or recovering actual damages, Plaintiffs contend Sutfin has not stated a claim with respect to any blank contracts. Instead, they say, Sutfin's alleged damages arise from Sutfin's decision *not* to execute Purchase Addenda on certain specific lots of feeder cattle. Plfs.' Reply ISO MSJ 5 (Dkt. 42). Thus, Plaintiffs argue, there is (1) no violation of the ICPA with respect to blank contracts on unexecuted Purchase Addenda, and (2) no damages under the ICPA with respect to earlier executed Purchase Addenda which may have been executed in blank.

The Court agrees that Sutfin has not alleged that it "suffer[ed] any ascertainable loss" by Plaintiffs' presentation of blank contracts, nor has Sutfin put forward evidence of any such

---

[8] Sutfin cites record evidence supporting its assertions in the omitted footnotes.

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 17**

damages, as required by Idaho Code § 48-608(1), so there is no basis for an ICPA claim premised on the practice of presenting blank contracts.

Sutfin also argues that certain of Plaintiffs' advertisements, including a sales brochure in the record at Docket No. 3-1, violate the ICPA by misrepresenting Plaintiffs' intentions and relationships with customers. The brochure in question includes the text "Partner with Investors * Both have 'skin in the game'" and "Buy Profitable Cattle * Break-even analysis * Historical performance data." (Dkt. 3-1 p. 5.) Sutfin argues this brochure falsely suggested that Plaintiffs would enter a legal partnership with its customers when it had no intention of doing so. This argument is not persuasive. The Court is not persuaded that a genuine issue of material fact exists to suggest that Plaintiffs phrased the brochure in such a way as to mislead intended recipients of the brochure into believing entering a contract would result in a legal partnership. The Court reaches the same conclusion as to Sutfin's allegation that Plaintiffs never intended to provide monitoring and advising services even though the brochure said that they would – in Sutfin's case, the Plaintiffs did provide such services for a period of six months. In such circumstances, Sutfin has not stated a prima facie case under the ICPA based on offering misleading advertising.

Finally, Sutfin claims that the Purchase Addenda were "excessively one-sided," that they improperly apportioned ownership and risk, and that they reference Agreements that do not exist. These allegations fail for the same reason as the allegation related to blank contracts fails: Sutfin has not sufficiently alleged that it suffered loss from any Purchase Addenda it executed, and it has not shown an ICPA violation as to Purchase Addenda it did not execute.

In sum, it is recommended that Count Four be dismissed in its entirety.

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 18**

**G. Plaintiffs' Motion for Summary Judgment Should Be Granted as to Count Five of Sutfin's Counterclaim.**

Sutfin raises a negligence claim in Count Five. Countercl. ¶¶ 78–86 (Dkt. 3). It alleges Plaintiffs had a "special relationship" with Sutfin that "gave rise to a duty to use ordinary care" in performing under the Agreement and in managing Sutfin's property. *Id.* It further alleges Plaintiffs breached that duty by (1) failing to provide timely projections; (2) failing to perform or negligently performing under the Agreement; (3) requiring Sutfin to enter into illegal contracts; (4) failing to consult Sutfin or its agent prior to any lot of cattle leaving Feedlot's facility; and (5) making excessive advances under the Agreement. *Id.*

Plaintiffs argue that there was no special relationship giving rise to a duty to use ordinary care and that any damage Sutfin suffered was purely economic and therefore not recoverable in negligence. Mem. ISO Plfs.' MSJ 13–14 (Dkt. 31-2).

Under Idaho law, the elements of a negligence claim are "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Holdaway v. Broulim's Supermarket*, 349 P.3d 1197, 1201 (Idaho 2015). Purely economic losses are not recoverable in a negligence action in Idaho, unless an exception applies. *Duffin v. Idaho Crop Improvement Assoc.*, 895 P.2d 1195, 1200 (1995). One exception exists when there is a "special relationship"[9] between the parties such that equity imposes a duty to exercise due care to avoid purely economic loss. *Id.* at 1201.

Such a special relationship has been found between an insurer and its insured, an attorney and his client, and, in *Duffin*, between a quasi-regulatory body which was "the only entity which

---

[9] This "special relationship" is distinct from a fiduciary relationship under Idaho law.

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 19**

can certify seed potatoes in the state of Idaho" and its client. *Id.* A special relationship is more likely to be found where a person "holds himself out to the public as having expertise regarding a specialized function, and that, by so doing, [he] induces reliance on his superior knowledge and skill." *Id.* (citing *McAlvain v. General Ins. Co. of America*, 554 P.2d 955, 958 (Idaho 1976)).

As to the existence of a "special relationship," Sutfin contends that Plaintiffs had the "specialized function" of being the only entities able to define equity under the Agreement. Def.'s Mem. ISO MPSJ 17 (Dkt. 33-1). Sutfin relies upon *Morningstar Holding Corp. v. GS, LLC*, 2011 WL 864300 (D. Idaho Mar. 10, 2011), for the proposition that a "special relationship may be established when a professional or quasi-professional performs personal services for a lay person, or when an entity holds itself out as having expertise in a specialized function and, by doing so, knowingly induce[s that person] to rely on that expertise." *Id.*

Sutfin is correct that the Agreement gave Simplot the unilateral authority to determine the market value, and therefore the equity, of Sutfin's cattle. However, this authority – to which Sutfin assented by executing the Agreement – is not "special" in the same way as the examples in Idaho case law on this issue. Sutfin does not suggest that it relied on, or that it was induced to rely on, Simplot's expertise in setting the market value of its cattle. Sutfin makes no argument, nor puts forward any evidence, that Simplot's calculation of market value was based on anything other than market prices (whether hedged or not hedged). And Sutfin could have independently evaluated the market value of its cattle. Sutfin may have relied on Plaintiffs' expertise in some general sense as a reason for entering into the Agreement, but that is not unusual in arms-length commercial transactions such as this was. In short, no "special relationship" existed here that gave rise to a duty by Plaintiffs to conform to a certain standard of conduct. Without such a special relationship there is no exception to the economic loss rule. Thus, Sutfin's negligence

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 20**

claim fails on both the duty and damages elements and it is recommended that Count Five be dismissed.

**H. No Recommendation Is Made Regarding the Parties' Argument as to the Applicability of the Commodity Exchange Act.**

Plaintiffs argue that Sutfin's "implied claim" for violation of the Commodity Exchange Act has not been specifically pled and is without merit. Mem. ISO Plfs.' MSJ 14–16 (Dkt. 31-2). Based on their own expert's testimony, they challenge the opinion of Sutfin's expert that the Purchase Addendum mechanism is illegal and in violation of the Commodity Exchange Act. *Id.* Sutfin frames this challenge as attacking its affirmative defense that the Agreement violates public policy and renders it unenforceable. Def.'s Resp. to Plfs.' MSJ 3–5 (Dkt. 39). Plaintiffs's reply persists in arguing this issue as a "claim" rather than as an affirmative defense. Plfs.' Reply ISO MSJ 9 (Dkt. 42) ("Defendant's claim for violations under the CEA are meritless.") The Court cannot identify such a claim within Sutfin's Counterclaim and therefore will not address Plaintiffs' arguments on this issue.

Sutfin suggests that summary judgment should be entered in its favor on this issue, but it does so only in its response to Plaintiffs' motion for summary judgment and in its reply to its own motion for partial summary judgment. Def.'s Reply ISO MPSJ 2 (Dkt. 40). It does not raise this issue in its motion for partial summary judgment. *See* Def.'s MPSJ (Dkt. 33). The record and arguments before the Court at this time are insufficient for a recommendation to be made on this issue because Plaintiffs argue it in terms of a claim rather than an affirmative defense and because Sutfin did not include it in its motion for partial summary judgment. This issue will have to be taken up, if at all, at another time.

**2.   Analysis of Sutfin's Motion for Partial Summary Judgment**

Sutfin moves for partial summary judgment seeking to dismiss Plaintiff Feedlot, to

dismiss Plaintiffs' claims, and for entry of judgment as to liability (but not damages) on Sutfin's

counterclaims alleging breach of contract, breach of fiduciary duty, and negligence. Each request

for relief will be considered in turn.

**A.   Plaintiff Feedlot's Claims Should Be Dismissed.**

Sutfin draws upon testimony from the Rule 30(b)(6) deposition of Feedlot's designee, in

which the deponent testified that the amounts owing under the Agreement all related to advances

made by Simplot:

> A.   So Sutfin chose to finance the feed bills. So the feed bill was financed by
> J.R. Simplot Company. So the damages in excess of one million dollars are
> all advances that Sutfin failed to repay.
> Q.   So Sutfin doesn't owe Simplot Livestock[10] any money? That has all been
> taken care of by J.R. Simplot?
> A.   I think you are splitting hairs here. But that is my belief, yes.
> Q.   And I'm not trying to – well, maybe I am. I just want to be clear what makes
> up this one million and some odd dollars. Is it all advanced money that
> hasn't been repaid? Or is it a feed bill that is still open? Or is it market losses
> that Simplot covered and they are due to somebody else?
> A.   It would be advances on the cattle and advances, you know, to Simplot
> Livestock for that feed bill. So, yes, if I'm thinking about it correctly the
> one million plus dollars would all be money owed to J.R. Simplot Company
> that was advanced to Sutfin Land & Livestock to either – either advances
> on cattle or advances for the monthly bills.

Simplot 30(b)(6) Depo. p. 132:4–24 (Dkt. 33-4). Sutfin argues that this testimony proves that

Feedlot has no damages, because its designee testified that any damages are owed to Simplot

rather than Feedlot. Def.'s Mem. ISO MPSJ 4–5 (Dkt. 33-1).

In response, Plaintiffs describe the damages arising from Sutfin's alleged breach of the

Agreement as "costs and expenses incurred by Feedlot to feed and care for Sutfin's cattle to

---

[10] "Simplot Livestock" is the name the parties used during this deposition for Feedlot.

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 22**

mature for market and for the repayment of financing advanced by Simplot." Plfs.' Resp. to Def.'s MPSJ 2 (Dkt. 36). They argue the services provided by Feedlot and the financing provided by Simplot are interrelated functions such that "it is impossible to separate out the Plaintiffs as separate parties" to the Agreement. *Id.* at 3. They note that Feedlot is an affiliated entity of Simplot and contend that because Plaintiffs have a common interest, failure to compensate either entity is a breach of contract to both Plaintiffs. *Id.* Finally, they observe that the Agreement gives Simplot sole discretion to assign its rights under the Agreement. *Id.* at 4. They do not cite any law supporting their assertions. Nor do they say, either in their briefing or in the attached declaration of Scott M. McNeley, a Feedlot employee, that Simplot actually did assign to Feedlot (or any other entity) any of its rights under the Agreement. *See* Suppl. Decl. of Scott M. McNeley (Dkt. 36-2).[11]

Damages are a necessary element to both of Plaintiffs' claims. The record is undisputed, based on the testimony of Plaintiffs' 30(b)(6) deponent and on the lack of any evidence indicating Simplot assigned its rights under the Agreement to Feedlot, that Feedlot cannot prove the damages element of either its breach of contract or breach of the covenant of good faith and fair dealing claims. Accordingly, it is recommended that any claim raised on behalf of Plaintiff Feedlot in Counts One and Two of Plaintiffs' First Amended Complaint be dismissed.

---

[11] The closest Plaintiffs come to claiming there was an assignment appears in the second paragraph of Mr. McNeley's supplemental declaration: "[Feedlot] administers the Simplot loans by advancing and collecting loan funds, such that [Feedlot] is authorized by Simplot to collect on the contract amounts due, in addition to Simplot." Of course, authority to collect on a debt is not coextensive with the debt being assigned. Mr. McNeley's statement does not establish that Feedlot's relationship to the Agreement or to the other parties was such that Feedlot was itself damaged by Sutfin's alleged failure to repay advances Simplot made.

**B.  Sutfin's Motion for Partial Summary Judgment Should Be Denied as to Count One of the First Amended Complaint.**

"The doctrine of avoidable consequences, or the duty to mitigate, is an affirmative defense that provides for a reduction in damages where a defendant proves that it would have been reasonable for the plaintiff to take steps to avoid the full extent of the damages caused by the defendant's actionable conduct." *McCormick Intern. USA, Inc. v. Shore*, 277 P.3d 367, 371 (Idaho 2012). "Whether it is reasonable to expect a plaintiff to perform specific acts of mitigation is a question of fact." *Id.* "The defendant bears the burden of proving that the proposed means of mitigation were reasonable under the circumstances." *Id.* Moreover, "when advancing a claim that the plaintiff failed to mitigate damages, the defendant must prove both that a means of mitigation existed and that the proposed course of mitigation would, in fact, have resulted in a reduction of the plaintiff's damages." *Id.* The reasonableness of the method selected by a plaintiff to minimize damages is a fact question. *Casey v. Nampa and Meridian Irr. Dist.*, 379 P.2d 409, 412 (Idaho 1963). "The doctrine of avoidable consequences requires reasonable effort to mitigate damages. Thus, if reasonable, the efforts need not be successful." *Davis v. First Interstate Bank of Idaho, N.A.*, 765 P.2d 680, 682 (Idaho 1988) (citation omitted).

Here, Sutfin seeks dismissal of Plaintiffs' breach of contract claim, alleging that Plaintiffs failed to mitigate their damages. Def.'s Mem. ISO MPSJ 7–13 (Dkt. 33-1). Sutfin contends that if Simplot had mitigated its damages, then Sutfin would not owe anything. *Id.* at 7. Sutfin faults Simplot for "cho[osing] to manage its own risk in an attempt to avoid or lessen damages to [Simplot]" after it determined Sutfin was in default. *Id.* at 8. Sutfin argues that "instead of locking in the safe bet that would have ensured that Sutfin's portfolio would, in fact, satisfy the advanced financing debt owed to Simplot, Simplot chose to gamble on the market." *Id.* Sutfin characterizes this as an "unreasonably risky approach to managing losses." *Id.* Sutfin says

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 24**

Simplot should have "forward-sold Sutfin's cattle to lock in the price that would have been sufficient to cover the debt due," which it suggests would have been "an approach certain to eliminate loss." *Id.* Sutfin bases these assertions on the testimony of Simplot's 30(b)(6) deponent. Simplot's designee stated that the company evaluated Sutfin's portfolio position in late summer and early fall 2015 and concluded that if cattle prices remained flat or increased "it was likely that Sutfin would be able to repay its debts" to Simplot. *Id.* at 10 (quoting Simplot 30(b)(6) Dep. pp. 121:13–122:13 (Dkt. 33-4).

It is not lost on the Court that Sutfin seeks to avoid liability by pointing to Plaintiffs' choice not to hedge Sutfin's cattle, when if Sutfin had chosen on its own to hedge the risk, Sutfin might have avoided the circumstances leading to this lawsuit. More pertinent to the immediate issue, however, is that Plaintiffs did undertake to analyze the market before choosing how best to mitigate their risk:

> A.    We could see that there was a reasonable chance that Sutfin would not be able to repay its debts. And so we were in the mode of managing our risk, which is synonymous with, you know – or in the mode of managing our risk of not being able to get paid back. And, you know, at that point the decision was made that it was best we could maximize the value of those cattle by taking them out to finish. And there was a chance that the market would go up instead of down. Had the market gone up – so speaking hypotheticals here. Had the market gone up much of the damages wouldn't exist. Had Simplot taken – had Simplot chosen to sell those cattle at that point in time they likely would have increased the losses to both Sutfin – to Sutfin. And to the extent that Sutfin defaults and doesn't pay the rest to Simplot.
>
> ….
>
> A.    Hindsight tells you that the result would have been better had a purchase addendum been entered into at that point in time. But as you know we don't have the benefit of hindsight at that point in time. Had a purchase addendum been entered into at that point in time, and the market would have gone up, Sutfin would have not made as much money as they could have. And I'm going to assume that Sutfin's investment goal is to make money. If we had made that decision it is likely that Sutfin would be – we would be in a lawsuit because we took away their ability to make money in an upmarket.
>
> Q.    And all of those factors then were considered by Simplot at the time that this report was run by Ms. Dawson?

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 25**

A.      Yes. Those are discussions that Bronc May and I had.

Simplot 30(b)(6) Depo. pp. 129:5–130:15, 131:7–22 (Dkt. 33-4). Thus, the evidence shows that

Plaintiffs were aware of the risks, that they contemporaneously analyzed those risks, and that

they selected a course of action intended to maximize the proceeds from the sale of Sutfin's

cattle. They may well have perceived that such a course was the best possible avenue for their

interests, but that choice also created a risk that the value of Sutfin's equity in the cattle might

drop below what Sutfin owed under the Agreement when Sutfin was in default. The latter

scenario is what developed, and even though Plaintiffs suggest that they were faced with a

Hobson's choice, a jury would not necessarily agree with them based upon the facts of this case.

Hence, there is a question as to what the duty to mitigate required of Plaintiffs in regard

to Sutfin's cattle and Sutfin's account. Sutfin contends that "none of Simplot's damages sought

in this case are recoverable," implying that if Simplot had met its duty of mitigation then there

would have been nothing owed by Sutfin under the Agreement. Def.'s Mem. ISO MPSJ 12–13

(Dkt. 33-1). But Sutfin does not show its math, nor does it describe which cattle lots it contends

could have been forward-sold on which date, or at what price, such that the proceeds would have

equaled or exceeded the amount Plaintiffs claim as contract damages. The Court is not required

to scour the record in an attempt to perform such calculations itself. At best, these are factual

questions to be considered by the jury. The dispute is not appropriate for resolution, on this

record, on summary judgment. It is therefore recommended that Sutfin's motion for partial

summary judgment be denied with respect to Count One of Plaintiffs' First Amended Complaint.

### C.  Sutfin's Motion for Partial Summary Judgment Should Be Granted as to Count Two of the First Amended Complaint.

Count Two of Plaintiffs' First Amended Complaint alleges that "Defendant failed to deal

honestly with the Plaintiffs, and Defendant is liable for a breach of the duty of good faith and fair

dealing." FAC ¶ 21 (Dkt. 26). Sutfin challenges that claim, arguing that "[a] violation of the implied covenant … does not result in a cause of action separate from the breach of contract claims, nor does it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant." *Drug Testing Compliance Grp., LLC v. DOT Compliance Serv.*, 383 P.3d 1263, 1273 (Idaho 2016). Sutfin contends that the damages Plaintiffs seek under their breach of the good faith covenant claim are identical to the damages they seek under their breach of contract claim. Def.'s Mem. ISO MPSJ 6 (Dkt. 33-1). Accordingly, Sutfin argues, the breach of covenant claim should be dismissed. *Id.*

Plaintiffs say they do not seek separate damages for the breach of the covenant of good faith; rather, they argue the claim is an alternative cause of action. Plfs.' Resp. to Def.'s MPSJ 4–5 (Dkt. 36). They characterize the damages sought under each claim as "equivalent" and they contend they have adequately stated each claim. *Id.* Plaintiffs also allege that they were "consequently and proximately injured and damaged as a result" of Sutfin's alleged breach of its duty to exercise good faith, and that such breach damaged Plaintiffs in the same amount ($1,041,119.21) as alleged in the breach of contract claim in Count One. *Id.* ¶¶ 22–23.

"A violation of the implied covenant is a breach of the contract. It does not result in a cause of action separate from the breach of contract claims, nor does it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant. To hold otherwise would result in a duplication of damages awarded for breach of the same contract." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 864 (Idaho 1991). Moreover, a violation of the covenant occurs only when a contract party violates, nullifies or significantly impairs any benefit of the contract. *Id.* at 863.

Here, Plaintiffs do not allege in the First Amended Complaint or describe in their response to Sutfin motion, any facts showing *how* Sutfin breached the covenant of good faith. Nor do they explain how this claim differs from their breach of contract claim. Their breach of the covenant of good faith claim alleges identical damages to their breach of contract claim; yet, no separate facts are pled, even if both claims might rely upon some overlapping facts. Even if raised as alternative claims, the two claims do not stand separate and apart. Furthermore, Plaintiffs do not allege how Sutfin violated, nullified, or significantly impaired any benefit of the contract besides the alleged breach of non-payment. Accordingly, it is recommended that Plaintiffs' claim for breach of the covenant of good faith, Count Two of the First Amended Complaint, be dismissed.

### D. Sutfin Is Not Entitled to Partial Summary Judgment on the Duty and Breach Elements of Its Breach of Fiduciary Duty or Negligence Claims.

Sutfin seeks partial summary judgment on the duty and breach elements of its counterclaims for breach of contract, breach of fiduciary duty, and negligence. Def.'s Mem. ISO MPSJ 13–20 (Dkt. 33-1). The Court has recommended above that Sutfin's breach of fiduciary duty and negligence claims be dismissed. Accordingly, Sutfin's motion for partial summary judgment on those issues need not be considered here. It is recommended that Sutfin's motion be denied to the extent it seeks partial summary judgment in Sutfin's favor on its breach of fiduciary duty and negligence claims.

### E. Sutfin Is Not Entitled to Partial Summary Judgment on the Duty and Breach Elements of Its Contract Claim.

Sutfin also seeks partial summary judgment on the duty and breach elements of its contract claim, alleging that Plaintiffs breached the Agreement by failing to provide break-evens. *Id.* at 19–20. As discussed above, there is a genuine issue of material fact regarding whether the

Agreement required Plaintiffs to provide Sutfin break-evens. Accordingly, Sutfin is not entitled to summary judgment on the duty and breach elements of its claim alleging it was damaged by Plaintiffs' failure to provide such break-evens during May and June of 2015.

Sutfin also seeks partial summary judgment on the duty and breach elements of a contract claim alleging that Plaintiffs breached the Agreement by failing to advise when Sutfin's equity fell below $200 per head. However, Sutfin's Counterclaim includes no such claim. Neither of the two breach of contract counts in Sutfin's Counterclaim alleges that Plaintiffs had a duty to advise Sutfin when equity was below $200 per head. *See* Countercl. ¶¶ 29–49 (Dkt. 3). Accordingly, it is recommended that Sutfin's request for partial summary judgment be denied on this issue.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

**REPORT AND RECOMMENDATION RE: SUMMARY JUDGMENT MOTIONS – 29**

## **RECOMMENDATION**

Based on the foregoing, IT IS HEREBY RECOMMENDED that Plaintiffs' Motion for Summary Judgment (Dkt. 31) be GRANTED IN PART AND DENIED IN PART as follows:

Summary judgment should be granted in favor of Plaintiffs as to Counts Three (breach of fiduciary duty), Four (violation of the Idaho Consumer Protection Act), and Five (negligence) of Defendant's Counterclaim. In all other respects the motion should be denied.

IT IS HEREBY FURTHER RECOMMENDED that Defendant's Motion for Partial Summary Judgment (Dkt. 33) be GRANTED IN PART AND DENIED IN PART as follows:

Summary judgment should be granted in favor of Defendant as to Count One of the First Amended Complaint (breach of contract), as to Simplot Livestock Co. only. Summary judgment should be granted in favor of Defendant as to Count Two of the First Amended Complaint (breach of the covenant of good faith and fair dealing). In all other respects the motion should be denied.

Pursuant to Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days. . ., unless the magistrate or district judge sets a different time period." Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

DATED:  **August 17, 2018.**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge